2023 IL App (1st) 220266
No. 1-22-0266
Opinion filed June 12, 2023

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

LISA BITSKY and THOMAS BITSKY,

 Plaintiffs,

v.

THE CITY OF CHICAGO, a Municipal
Corporation; CH2M HILL ENGINEERS, INC.;
EXP FEDERAL INC., f/k/a/ Teng & Associates,
Inc.; and ARCADIS U.S. INC., f/k/a The Rise
Group, LLC, All d/b/a/ CTR Joint Venture;
ENVIRONMENTAL DESIGN
INTERNATIONAL, INC. (EDI), an Illinois
Corporation; CH2M HILL ENGINEERS, INC.,
Individually; EXP FEDERAL, INC., f/k/a Teng
& Associates, Inc., Individually; and ARCADIS
U.S. INC., f/k/a The Rise Group, LLC,
individually; SANCHEZ CONSTRUCTION
SERVICES, INC., f/k/a Sanchez Construction
Company, an Illinois Corporation; RELIABLE
CONSTRUCTION AND EQUIPMENT
COMPANY, an Illinois Corporation;
PRECISION CEMENT COMPANY, INC.; and
EDWARD A. MCGINLEY, Individually and
Director of Precision Cement Company, Inc.,

 Defendants

(Lisa Bitsky, Plaintiff-Appellant; Sanchez
Construction Services, Inc.; Reliable
Construction and Equipment Company; Precision
Cement Company, Inc.; and Edward A.
McGinley, Defendants-Appellees).

Appeal from the Circuit Court
of Cook County.


Nos. 17 L 1845
and No. 19 L 8025 (cons.)


The Honorable
Joan E. Powell,
Judge, presiding.

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Coghlan concurred in the judgment and opinion.
Justice Pucinski specially concurred, with opinion.

**OPINION**

¶ 1    In 2011, the City of Chicago (City) undertook a water restoration project to replace underground water mains and install sidewalks and ramps adhering to the Americans with Disabilities Act. The City hired CTR Joint Venture (CTR) as the project engineer and Sanchez Constructions Services (Sanchez) as project contractor. Sanchez subcontracted the sidewalk and ramp work to Reliable Construction and Equipment Company (Reliable), which verbally subcontracted the cement work to Precision Cement Company, Inc. (Precision).

¶ 2    After the water main work was completed at the intersection, the resulting sidewalk had an elevated section. The City and CTR inspected the work and approved it as compliant with the contract terms, the City's specifications, and ADA requirements.

¶ 3    Several years later, Lisa Bitsky was injured when her husband, Thomas Bitsky, tripped and fell into her, while walking on the elevated sidewalk near that intersection. Believing the elevated sidewalk was responsible for her injuries, Bitsky brought construction negligence claims against the City and CTR Joint Venture, later adding Sanchez, Reliable, Precision, and Precision's owner, Edward McGinley.

¶ 4    After settling with the City and CTR, Bitsky proceeded against Reliable, Sanchez, and Precision, which, after extensive discovery, filed separate motions for summary judgment. Among their arguments: (i) they followed the plans and specifications provided by the City and CTR when installing the sidewalk and, thus, owed no legal duty to Bitsky, (ii) Bitsky failed to show proximate cause between her injuries and their work, (iii) the elevated sidewalk was

an open and obvious condition, and (iv) they had no notice of the alleged dangerous condition created by the raised sidewalk.

¶ 5    After a hearing, the trial court granted summary judgment to defendants, finding that because they followed the requirements of their contracts and the plans, specifications, and instructions the City and CTR provided them, they had no duty to Bitsky, specifically citing the Illinois Supreme Court's decision in *Hunt v. Blasius*, 74 Ill. 2d 203 (1978). Further, the court noted the City and CTR inspected and approved defendants' work.

¶ 6    Bitsky argues that (i) a material question of fact exists as to whether defendants deviated from the plans when they constructed the sidewalk, (ii) the court erred in relying on *Hunt* and should have applied traditional negligence factors, and (iii) if summary judgment on the negligence counts is reversed, the court also should reverse summary judgment on her husband's loss of consortium claims. We agree with the trial court that *Hunt* is controlling, and defendants had no duty to Bitsky where they followed the city's plans, specifications, and instructions. So, we affirm.

¶ 7                                    Background

¶ 8    Lisa Bitsky and her husband, Thomas Bitsky, were leaving a restaurant on Milwaukee Avenue after dinner with friends Alan and Christine Brown. The couples were walking to their cars, with Lisa Bitsky and Christine Brown walking a few feet ahead of their husbands. While next to a building at 1286 N. Milwaukee Avenue, Thomas stumbled and fell forward, hitting the back of Lisa's knee with his neck and shoulder. Lisa fell forward, hitting the sidewalk with her left leg, requiring surgery on her tibia and ankle.

¶ 9    Thomas did not know what caused him to fall, saying his left foot suddenly stumbled, and when he tried to put his right foot down to catch himself, "there was nothing under it." A

photograph, introduced during depositions, shows the sidewalk abutting the building at 1286 N. Milwaukee is elevated with a 2-foot-wide by 8.29-foot-long elevation that increased from zero inches up to 5.25 inches.



¶ 10                                    Water Restoration Project

¶ 11         The area of the accident was part of a 2011 water restoration project the City of Chicago undertook to replace and restore underground water mains and construct sidewalks that comply with ADA requirements. The City's Department of Transportation (CDOT) hired an architect

to prepare ADA design standards (CDOT standards) for contractors to use when constructing ADA sidewalks and sidewalk ramps.

¶ 12 The City hired CTR Joint Venture as an engineering consultant on the project. CTR was responsible for developing design and construction drawings and identifying corners that needed restoration to bring the sidewalks into compliance with ADA and CDOT standards. CTR contracted to ensure full compliance with ADA codes and standards.

¶ 13 Reliable was the general contractor. Reliable subcontracted with Sanchez to build ADA-compliant curbs and sidewalks. Sanchez verbally subcontracted the concrete work to Precision.

¶ 14 Saeed Siddiqui, CTR's restoration inspection engineer, testified by deposition that restoration work on the project consisted of (i) pouring cement over the open trench area, after the water main pipe had been replaced, and (ii) fixing damaged streets and sidewalks. Siddiqui said the contractor and subcontractors did not build the elevated sidewalk, variously referred to as a "property line curb," a "barrier curb," or a "Type-B curb" (hereafter, "property line curb"). The property line curb preexisted the project and was part of the foundation of the building at 1286 N. Milwaukee Avenue. Siddiqui said that when coming across a preexisting property line curb, the practice is not to destroy it but to build a ramp around it. Siddiqui said a property line curb is covered under the City's ADA standards (CDOT ADA standard B-1-6) and can be used, "where necessary," when, for instance, a sidewalk has varying elevations or, as here, a building's foundation is exposed. Standard B-1-6 does not specify exact sizes and dimensions for a property line curb, which depends on the needs at a specific corner.

¶ 15 Siddiqui testified he inspects the finished work to ensure it complies with ADA regulations and follows the specifications required by the contract. If the contractor did not follow plans, specifications, and instructions, the contractor would not get paid.

¶ 16        A CTR engineer, Christopher May, testified he oversaw the repair sites and ensured the sidewalk ramps met CDOT specifications and ADA standards. After defendants completed the work, May conducted a quality control inspection of the sidewalk. His initial report indicated that the corner of Milwaukee Avenue and Paulina Street did not pass inspection. But in June 2013, a CTR quality assurance inspector determined the corner to be ADA compliant.

¶ 17        Reliable was responsible for installing the water main but did not perform concrete or sidewalk installation work. According to Todd Chianelli, Reliable's superintendent on the project, CTR forwarded quality control issues to Reliable, which sent them to Sanchez for making the repairs. CTR then returned to inspect and approve the work. For Reliable to receive final payment, which it did, CTR had to approve the sidewalks and ramps as compliant with ADA and CDOT standards.

¶ 18        Sanchez's project manager, Michael Byrne, testified that the company used CDOT and ADA standards to construct the sidewalk and ramps in compliance with the City's specifications. Byrne was not at the Milwaukee and Paulina intersection during the work but received quality control reports from Chris May at CTR and forwarded them to Precision, the concrete subcontractor. Byrne said property line curbs are common in sidewalk construction, and the one at Milwaukee and Paulina was consistent with similar repairs.

¶ 19        Joe Haughey, owner and president of Sanchez Construction, testified that the company installed nearly 100 property line curbs in Chicago. He said CDOT design standard B-1-6, used here, was a safe design, not dangerous or defective, and fully complied with the City's specifications and ADA standards. He also said nothing in the CDOT standards requires a property line curb to be a certain height or width, and the contractor can decide based on the requirements of the specific situation.

¶ 20    Edward McGinley owned Precision, the concrete subcontractor, until it went out of business in 2016. McGinley testified that Precision was responsible for installing the concrete and "poured the job *** per the ADA codes." Precision used design standard B-1-6 at that corner because of the exposed foundation, the need to comply with slope specifications and placement of the keystone at that corner. He considers the design to be safe.

¶ 21    Precision's foreman, Richard Bong, said after Sanchez removed the sidewalk, Precision installed the ramp and sidewalk. He chose design standard B-1-6 from the CDOT standards "because that's really the only one you can use in that corner." He further said the property line curb could not have been made five to six inches wide (rather than 24 inches) due to an obstruction from the building and because the running slope had a minimum size of four feet "so we matched the running slope sidewalk to the landing to the property line." He acknowledged the property line curb at that corner was not intended for people to walk on. He also acknowledged that Chris May inspected the sidewalk and found it failed, but he thought May misunderstood that it was a property line curb. Nonetheless, Bong went to the site, fixed any deficiencies, and ensured compliance with ADA standards.

¶ 22    Bitsky submitted handwritten affidavits from the store owner and the store owner's friend, attesting to the hazardous condition created by the elevated sidewalk. The store owner stated he asked the workers about the elevated sidewalk during construction and warned them it would be a tripping hazard, and they told him it was "in the plan." He said pedestrians trip over the elevated sidewalk almost daily. He contacted the City and his alderman numerous times, asking that the sidewalk be leveled, but "gave up *** because nothing was being done." Similarly, his friend stated he had seen people fall across the sidewalk and he fell on a winter day when snow covered the sidewalk. He also contacted the alderman's office to no avail.

¶ 23    Anthony Koldan, a CDOT employee, inspected the corner after the City received a call in August 2013. Koldan said the property line curb was necessary to protect the foundation and get the proper elevation for ADA compliant ramps. He said that, on inspection, "no construction issue was found" and "this would have been exactly the way that I would have instructed this to be built."

¶ 24    Bitsky retained Dr. Elliot Dudnik, who has a Ph.D. in civil engineering, as an expert to review the circumstances of the fall. Dudnik issued a report that the intersection was unsafe and dangerous and that certain conditions there contributed to and proximately caused Thomas Bitsky's fall. Specifically, he opined that Thomas Bitsky took a misstep and fell into his wife because of a change in elevation of the sidewalk, creating a hazardous condition with no warning. He further stated a barrier constructed to protect the exposed portion of a building's foundation (i) should not exceed six inches in width (the area where Thomas fell was 24 inches wide) and should not be more than a quarter inch high to avoid creating a tripping hazard, (ii) should wrap around the side of the building rather than create a drop-off, and (iii) should have had a rounded top. In short, Dudnik asserted defendants deviated from the contract requirements and plans and the CDOT ADA standards.

¶ 25                                    Procedural History

¶ 26    Bitsky initially sued the City alone, alleging two counts of negligence in constructing the sidewalk and two counts on her husband's behalf for loss of consortium. She later amended her complaint to add CTR and other defendants. On February 25, 2020, Bitsky filed a 24-count fourth amended complaint alleging, in part, negligence against Sanchez (count XV), Reliable

(count XVII), and Precision (count XIX). Counts XVI, XVIII, and XX, were derivative loss of consortium counts against each.

¶ 27    Each defendant filed a motion for summary judgment. Precision and Reliable argued, in part, that (i) they had no duty to a third party where the sidewalk met ADA plans, specifications, and standards, (ii) Bitsky could not prove proximate cause, and (iii) the alleged condition of the sidewalk was open and obvious. They also argued Thomas Bitsky's intervening negligence by allegedly failing to keep a proper lookout. Sanchez similarly claimed they owed no duty to the Bitsky: (i) they followed the City's plans and specifications, which did not create an unreasonably dangerous condition, (ii) their contract with Reliable created no duty to Bitsky, and (iii) traditional factors limit the scope of any duty. They also argued Bitsky presented no "affirmative proof" that the condition of the sidewalk caused her injuries.

¶ 28    Bitsky argued, in response, that material questions of fact remained to bar summary judgment, including (i) whether defendants had a duty to Bitsky to build an ADA compliant sidewalk, (ii) whether defendants failed to follow the contract plans and specifications and exercised their discretion in constructing a sidewalk that created a dangerous condition, (iii) whether the elevated sidewalk was the proximate cause of Bitsky's injuries, and (iv) whether the elevation was open and obvious. Bitsky also argued that defendants owed them a duty of care under traditional negligence factors.

¶ 29    After a hearing, the trial court granted all three motions for summary judgment "for the reasons stated on the record." The court said, "even if I were to agree *** that open and obvious is a jury question, and *** proximate cause is probably a jury question," under the holding in *Hunt v. Blasius*, "an independent contractor *** is not liable to third persons for injuries once the completed work had been accepted by the state" with certain exceptions, including "if the

work done was imminently dangerous to life or health of third persons." The court noted that defendants "had some discretion ·here, [but] it's not discretion in a vacuum. Everything ·has to be *** compliant, and if it's not, it's supposed to be signed off on, approved, changed, or *** supervised by CTR, the City [and]***the CDOT people who even come up with the plans."· The court concluded that because the City and CTR approved the work, defendants had no duty to third parties. The trial court denied Bitsky's motion to reconsider.

¶ 30                                   Analysis

¶ 31                             Standard of Review

¶ 32      Summary judgment applies where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue regarding any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The court construes the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* Summary judgment should be granted where the movant's right is clear and free from doubt. *Id.* We review the grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14.

¶ 33                   *Hunt* and Defendants' Duty to Plaintiff

¶ 34      Bitsky argues the trial court erred in relying on *Hunt*, 74 Ill. 2d 203, and that *Jarosz v. Buona Cos.*, 2022 IL App (1st) 21018,1 controls and supports reversal. *Jarosz* was issued after

the summary judgment order and thus not addressed by the trial court. Nonetheless, *Jarosz* is distinguishable, and the trial court properly relied on *Hunt*.

¶ 35        In *Hunt*, the State of Illinois hired Fosco Fabricators (Fosco) to construct and install a highway exit sign in strict conformity with standards set by the State. *Hunt*, 74 Ill. 2d at 206. Fosco followed those specifications, and the State approved and accepted the work. *Id.* at 206-07. More than three years later, a car veered off the highway and collided with the post, killing two occupants and injuring three. *Id.* at 206. A lawsuit for negligence and strict liability was filed against multiple parties, including Fosco. *Id.* Eventually, only Fosco remained. *Id.*

¶ 36        Fosco moved for summary judgment. *Id.* It submitted an uncontroverted affidavit establishing it designed, constructed, and installed the sign and post in strict conformity with the specifications required by the State of Illinois. *Id.* at 206-07. The trial court granted Fosco's motion, finding that because Fosco was an independent contractor, it was relieved from liability to any third parties once the State approved and accepted the work it performed. *Id.* at 207. The appellate court affirmed, and the plaintiffs appealed.

¶ 37        The court observed that the old "general rule of nonliability ha[d] been discarded" (*id.* at 209), after reviewing the history of independent contractor liability to third parties for work completed and accepted by the contracting party. Instead, the court would examine the negligence claim under the traditional rules of liability for negligence actions—by analyzing whether there was a duty, a breach of that duty, and proximate causation of injury from the breach. *Id.* In addressing the duty prong, the court stated, "[a]n independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he [or she] has merely contracted to follow." *Id.* If the contractor performs the specifications provided to it

"carefully," the contractor "is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them." *Id.*

¶ 38    The court found the plaintiffs failed to allege the specifications the State gave Fosco for the exit sign were so flawed as to put Fosco on notice that the sign would be dangerous and likely to cause injury. *Id.* at 210. The court further found the plaintiffs failed to set forth facts from which the court could infer that the State's specifications "were so glaringly dangerous Fosco should have refrained from complying with the specifications." *Id*. Because the plaintiffs failed to make these allegations, no basis existed on "which Fosco can be held liable in negligence for merely complying with the State's contract specifications." *Id.*

¶ 39    Nearly 45 years later, in *Jarosz*, the appellate court followed the holding in *Hunt* (as it must) but denied summary judgment, absent uncontroverted evidence defendants were following specifications provided in a contract. *Jarosz*, 2022 IL App (1st) 210181 ¶ 36.

¶ 40    The plaintiff in *Jarosz* tripped and fell outside a Buona Beef restaurant. *Id. ¶* 5. The plaintiff briefly lost consciousness and did not know what caused her to fall. A doorstep near where she fell had been installed by Mobile Lock and Safe, Inc. (Mobile Lock) *Id.* Mobile Lock moved for summary judgment, arguing that, as the installer of the doorstop for the property owner, it did not owe plaintiff a duty of care. *Id.* ¶ 17. The trial court agreed. *Id.* ¶¶ 17-18. The plaintiff argued on appeal that the completed and accepted work doctrine, on which Mobile Lock relied, was no longer valid, Mobile Lock owed her a duty of care as a matter of law, and genuine issues of material fact remained as to breach of duty and proximate cause.

¶ 41    In reversing the trial court, the appellate court noted that "in Illinois, the completed and accepted work doctrine no longer is determinative of the question of liability." *Id.* ¶ 30. Citing *Hunt*, the court stated that, in assessing contractor liability toward a third party, "traditional

principles of negligence govern" (*id.*)—namely, whether (i) the defendant owed her a duty of care, (ii) the defendant breached that duty, and (iii) the breach proximately caused her injuries. *Id.* ¶ 32. The court further stated, "In *Hunt*, the defendant provided an uncontroverted affidavit establishing that the highway exit 'sign and supporting posts were designed, constructed and installed by [the defendant] in strict conformity to specifications mandated by the State of Illinois.' *Id.* at 206." *Id.* ¶ 35.

¶ 42      The appellate court determined that, unlike in *Hunt*, "there is no uncontroverted evidence that Mobile Lock selected and installed the doorstop in strict conformity to specifications mandated by the Buona entities." *Id.* ¶ 36. The court noted that Buona employees testified they did not give Mobile Lock employees instructions on where to put the doorstop, except to say which door needed the doorstop. *Id.* Rather, they relied on Mobile Lock's employees to install the doorstop in a proper and safe location. *Id.* That testimony contradicted the deposition testimony of another employee, who was "certain" someone from the Buona corporate office decided the location. *Id.*

¶ 43      Absent "uncontroverted evidence," "Mobile Lock cannot rely on the defense discussed in *Hunt* for contractors who merely follow plans, specifications, or instructions for which they were contracted." *Id.* Accordingly, the appellate court applied the four duty factors to determine duty: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant" (*id.* ¶ 34). After discussing the factors, the appellate court determined Buona had a duty to the plaintiff and reversed summary judgment. *Id.* ¶ 47.

¶ 44      Relying on *Jarosz*, Bitsky contends the trial court erred in granting summary judgment because (i) the accepted work doctrine no longer applies to contractors and (ii) the court should

have applied traditional negligence principles. While true that the accepted work doctrine no longer shields contractors and subcontractors from all liability, the *Jarosz* court acknowledged that under *Hunt*, "[a]n independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow." (Internal quotation marks omitted.) *Id.* ¶ 35. Thus, "[i]f the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them" when there is uncontroverted evidence "[a]n independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow." (Internal quotation marks omitted.) *Id.*

¶ 45        Here, as in *Hunt*, defendants presented uncontroverted evidence of having followed the City's and CTR's plans, specifications, and instructions. CDOT prepared ADA design standards, including design standard B-1-6, which defendants used. Standard B-1-6 allows for a property line curb "where necessary." As multiple witnesses testified, property line curbs are used when, as here, a building's foundation is exposed. Further, standard B-1-6 does not require specific dimensions. Although Bitsky's expert issued a report that the elevated sidewalk did not meet CDOT ADA standards, as the trial court noted, the City and CTR inspected the area and approved all of the work as compliant with CDOT and ADA standards.

¶ 46        Furthermore, nothing in the record suggests the plans the City and CTR provided to defendants were "obviously dangerous." An obviously dangerous condition has been found, where, for instance, a defendant manufactured and supplied an underground propane gas tank without a plug for the drain, allowing gas to escape that could lead to an explosion. See *Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d 28 (1956). (The trial court discussed these cases

involving obvious danger and found them distinguishable.) Although Bitsky asserts that the elevated sidewalk was "unreasonably dangerous," she does not argue the plans and specifications were so obviously dangerous that no competent contractor would follow them.

¶ 47 Bitsky's contention that the trial court failed to consider all of the evidence presented, including the report and deposition of her expert, is without merit. The trial court considered the expert's report and deposition testimony. Bitsky's attorney cited both documents in her argument, and the trial court referred to them several times. Indeed, the trial judge read directly from the expert report's conclusion that the elevated sidewalk did not meet CDOT ADA standards. The court held, however, that although defendants had some discretion in constructing the sidewalks under the guidelines provided, the City and CTR approved the work as compliant with contract requirements and CDOT ADA standards.

¶ 48 Given our agreeing with the trial court's finding that defendants had no duty to Bitsky, we need not address her arguments regarding proximate cause, whether the elevated sidewalk was an open and obvious condition or the loss of consortium claims.

¶ 49 Affirmed.

¶ 50 JUSTICE PUCINSKI, specially concurring:

¶ 51 The confluence of necessary and welcome ADA sidewalks, with Chicago's existing and sometimes very old sidewalks and buildings creates a menace that I have personally observed all over the city. I am actually surprised that more people are not injured walking normally and colliding with elevated or lowered sidewalks or elevated corners like this one. I emphatically urge the City of Chicago to review its codes and inspection procedures to improve warning marks for pedestrians encountering these hazards.

***Bitsky v. City of Chicago*, 2023 IL App (1st) 220266**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17-L-1845, 19-L-8025; the Hon. Joan E. Powell, Judge, presiding. |
| **Attorneys for Appellant:** | Robert G. Black, of Law Offices of Robert G. Black, P.C., of Naperville, for appellant. |
| **Attorneys for Appellee:** | Adam S. Kreuzer and Jeffrey S. Barger, of Esp Kreuzer Cores, LLP, of Wheaton, for appellee Sanchez Construction Services, Inc. |
| | John J. Moroney and Michelle L. Bisognani, of Franco Moroney Buenik, LLC, of Chicago, for appellee Reliable Construction and Equipment Company. |
| | Stephen Brandenburg, of Cameli & Hoag, P.C., of Chicago, for other appellees. |